**Dated: July 27, 2018**

**The following is ORDERED:**



TOM R. CORNISH
UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

IN RE:

**MICHAEL G. GAMBLE,**                       **Case No. 16-80193**
                                             **Chapter 7**

      **Debtor.**

**PINNACLE AGRICULTURE**
**DISTRIBUTION, INC.,**
        **Plaintiff,**

**vs.**                                      **Adv. Case No. 16-8017**

**MICHAEL G. GAMBLE,**
        **Defendant**.

## <u>MEMORANDUM OPINION</u>

Plaintiff Pinnacle Agriculture Distribution, Inc. ("Pinnacle") seeks a determination that

Defendant Michael G. Gamble should be denied a discharge of his debts pursuant to 11 U.S.C.

§ 727(a)(2)(A), (2)(B), (3), (4)(A), and (5).  Alternatively, Pinnacle seeks to except his debt from

discharge pursuant to 11 U.S.C. § 523(a)(2)(A). A trial on the merits was held jointly with Pinnacle's adversary case against Michael Gamble's brother and business partner, Othel H. Gamble, Jr., Adv. Case No. 16-8018-TRC. After careful review of the testimony and exhibits admitted, as well as the relevant legal arguments and authority, the Court finds that Pinnacle did not meet its burden of proof by a preponderance of the evidence, and Michael G. Gamble is entitled to a discharge. The Court also finds that Pinnacle failed to establish that its debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

## I.   Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

## II.   Findings of Fact

Michael G. Gamble ("Michael") is a resident of Spiro, LeFlore County, Oklahoma.[1] At the time of trial, Michael was 69 years of age. He and his wife, Susan, have been married nineteen (19) years. Michael's career in farming began in 1975, after having been a coach for ten years. Michael's farming operations included Mike Gamble Farms which raised corn, wheat and soybeans, and M & G Farms which raised chickens. M & G Farms did not do any business with Pinnacle. Chickens raised by M & G Farms were owned by OK Industries. Michael owned the chicken houses, and had a verbal agreement with a neighbor, Sharon Perdue, that she would operate the chicken houses and they would split profits.

Michael also farmed with his brother, Othel H. Gamble, Jr., ("Othel") as a general partnership known as Gamble and Gamble Cattle Co. ("G&G"). According to Michael, G&G

---

[1]To the extent any facts are not separately set forth herein but are included in the discussion of conclusions of law, they are incorporated herein by reference as additional findings of fact.

made money but its income was reinvested back into the farming operation, with the exception of a one-time draw taken by each brother. G&G never owned any land in its name, but farmed cropshares on 7,000 acres.[2] Its primary crop was soybeans, with some wheat as well. Together, the Gambles farmed nearly 10,000 acres. Some of the land they farmed was owned by their mother's trust. Michael also stated that G&G probably paid for more of the combined farming expenses than was its actual share of those expenses. Michael does not own a personal vehicle, but drives a 2011 farm truck. He estimated monthly living expenses at $1500 to $2500. After paying his living expenses, all remaining income was used to continue his farming operations.

Pinnacle sold farming products consisting primarily of seed, fertilizer and chemicals to Michael for use in G&G and in his own personal farming operation, Mike Gamble Farms. The Gamble brothers purchased these farming products at a farm store in Spiro, identified as "Sanders," which was convenient to the location of the Gamble farming operations. According to Othel, as long as the Gambles bought a sufficient amount of fertilizer, chemicals and other farm products, Sanders provided some of the seed at no cost. Apparently, Sanders was owned by Pinnacle, although the parties did not provide any evidence regarding the corporate relationship. Othel stated that he had never met anyone from Pinnacle. Pinnacle did not have a corporate representative present at trial nor did anyone other than the Gambles testify about the Pinnacle account. Pinnacle offered no evidence regarding the process for setting up an account nor any financial statements or information provided to it by the Gambles. Othel stated that either he or Michael wrote checks to Sanders every Friday for chemicals, fertilizer and seed purchased that

---

[2]Othel described "crop shares" as an arrangement whereby the landowner receives 25% of the gross revenues while the tenant farmer pays all expenses and receives the remainder of revenues.

week.[3] Michael guessed that they likely filled out an application form at the Sanders' store but otherwise could not remember how they set up an account.

The Gambles did not prepare their own tax returns or financial statements. Instead, they employed BKD, LLP accounting firm ("BKD") to review their bank records and prepare tax returns on behalf of themselves, their farming operations and G&G. BKD has been Michael's accountant agency since 1975. For many years, like Othel, Michael kept a ledger of all business expenses and receipts. He did not keep a separate record of personal expenses. At BKD's suggestion, the Gambles discontinued this practice, noted the purpose for each expenditure on their checks, and provided the bank statements and check copies directly to BKD. This was to provide more detailed information for preparation of audits of G&G. BKD prepared Michael's tax returns using the information in the bank statements he provided to it. Prior to filing bankruptcy, tax returns were the only financial documents BKD prepared for him. After he filed bankruptcy, BKD prepared a financial report regarding Michael's farm operations in 2016 using Quickbooks.

Michael banked at First National Bank in Ft. Smith, Arkansas ("FNB") and Community State Bank ("Community Bank") located in Spiro, Oklahoma. He had two accounts at FNB. One account, known as Michael G. Gamble dba Mike Gamble Farms, was for his crop farming operations and for personal expenses. He signed the majority of checks on this account, but Othel also signed checks. The other account was for his poultry operation: Michael G. Gamble dba M & G Farms. Most checks written on the M & G Farms' account were signed by Sharon Perdue, but Michael signed some checks on that account. Like Othel, Michael had a $400,000 operating line of credit with FNB, secured by a blanket lien on all assets, including real estate,

_____

[3] The majority of payments to Pinnacle were issued on the G&G bank account. *See* Pl.'s Ex. 9.

chicken houses, crops, equipment, and cattle. This operating line was cross-collateralized with G&G assets and Othel's assets. Michael also had an account at Community State Bank which served as the depository account for his Social Security income. This account was opened when he began drawing social security, $1300 each month, approximately sixteen months before he filed bankruptcy.

Michael testified that all of his income was deposited into one of these accounts. Michael used some income for personal living expenses and the rest went to pay bills of the farming operations. Most deposits into his FNB Mike Gamble Farms account were noted by the phrase, "Adv." or "trsf", apparently an abbreviation meaning the deposits came from an advance or transfer on his line of credit with FNB. According to Othel, when funds were needed, they called FNB to request funds, and a bank employee would advance funds on the line of credit into a checking account or the G&G checking account. Corroborating this testimony were deposit slips for Othel's FNB account, Michael's Mike Gamble Farms account and the G&G account. These deposits slips appear to be counter deposit slips, lacking a preprinted account holder name, address and account number. The handwriting on these counter deposit slips differed from that of Michael, Othel, Kay or Sharon Perdue. Regardless of which Gamble entity account the advances were deposited, the handwriting of each deposit slip was the same, indicating that the same FNB employee or officer handled the advances from their lines of credit into the Gambles' various accounts. As for income from the sale of crops or other transactions, Michael deposited those funds into his Mike Gamble Farms account at FNB, and the funds were transferred to reduce the line of credit. Othel testified that the entire balance due on the FNB line of credit was to be paid each year. He was not able to do that. Michael indicated that he, too, was unable to service his debt to FNB.

Checks written on the FNB Mike Gamble Farms account included a brief notation of the purpose in the memo line, such as fuel, repair, supplies, insurance premium, utilities, wages, taxes, and interest. There were some cash withdrawals but they were $500 or less. Michael signed most of the checks on this account. He also had automatic drafts in place for cell phone bills, utilities, and taxes. Checks written to employees for wages included deductions for federal and state payroll taxes noted on the memo line. His FNB accounts incurred some overdraft charges and service fees. Michael made at least two payments to Sanders (Pinnacle) from his Mike Gamble Farms, one for $80,000 on June 12, 2015, and another for $17,329.69 on August 10, 2015.[4]

G&G also had a checking account at FNB. Othel and Michael were signators on this account. Bank statements from April 1, 2015 through May 31, 2016 reflected check-writing practices nearly identical to those of Othel and Kay's, and Michael's bank accounts. Checks included notations on the memo line of the type of expense being paid, such as fuel, repairs, payroll, or equipment. Michael estimated that some months, fuel costs were $20,000. Monthly payments were made electronically for utilities and to the IRS. Payments to the IRS ranged from $2300 to $5000 each month. Large deposits were made into this account with the notation "Adv". Other deposits were identified as proceeds from crop or livestock sales, or insurance claims. Payments to Pinnacle's store, Sanders, were made from this account ranging from approximately $14,000 to $180,000 a month. Payments to Sanders drastically decreased to $2400 in October 2015 and ceased thereafter. G&G paid Pinnacle approximately $471,540 from April through November of 2015. No draws or payments were made on this account to Othel or Michael until January and February of 2016. Twenty thousand dollars each was transferred to

---

[4]Pl.'s Ex. 7-016, 029.

Othel and to Gamble Farms (Michael's farming operation) in January 2016. An additional $20,000 was transferred to Othel's FSB account in February. These transfers are reflected in their personal bank accounts.

The Gambles' farm operations suffered through multiple years of drought which strained their financial resources. In 2015, they experienced contrary weather conditions: devastating floods. The Gambles, including G&G, lost a combined total of 10,000 acres of soybean and wheat crops. The first flood occurred approximately May 20, 2015. Michael carried crop insurance through Diversified Crop Insurance Co., so he made a claim against that insurance for lost crops. He received a payment of $24,023 on July 30, 2015, and deposited those funds into his FNB Mike Gamble Farms account on August 20, 2015.[5] The notation on the deposit slip reflected that the funds were from wheat insurance. He received another payment on September 15, 2015 from Diversified for $6073, which was deposited September 24, 2015.[6] He received a third payment on December 4, 2015 for $3718, which was deposited on December 16, 2015.[7] Michael stated that these checks had First National Bank's name on them, as well as his.

Another storm and flood occurred approximately October 15, 2015. Another flood occurred in December of 2015. Besides losing crops in the field, irrigation equipment and a combine owned by Othel were severely damaged by the December floods. Although Michael did not own the irrigation equipment that was damaged, he did use some of that equipment. Othel insured the equipment and received the insurance proceeds for that equipment.

---

[5]Pl.'s Ex. 7-027.

[6]Pl.'s Ex. 7-033.

[7]Pl.'s Ex. 7-051. *See also* Pl.'s Ex. 16-001, Mike Gamble's 2015 1099 from Diversified Crop Insurance Services.

In the midst of these floods, crop failures and loss of equipment, Pinnacle filed a collection action in federal court, the Eastern District of Oklahoma, against Othel, Michael, and G&G. On December 8, 2015, Pinnacle obtained a default judgment against Michael and Othel, jointly and severally, in the amount of $567,378.61.[8] Pinnacle also obtained a default judgment against Othel individually in the amount of $802,446.73. The judgment did not contain any language suggesting defalcation or fraud by the Gambles. In February of 2016, Pinnacle garnished the FNB bank accounts of Othel and Kay, Michael Gamble, and G&G for approximately $222,000.[9] From that time on, Michael no longer used his FNB accounts. Instead, he began to use his Community State Bank account for farm operations and personal expenses.

The garnishment was the tipping point prompting the Gambles to seek bankruptcy protection. Othel, Michael and G&G each filed bankruptcy under Chapter 12 on March 4, 2016. In filing bankruptcy, the Gambles hoped to obtain an extension on their line of credit with FNB or secure a new line for $1,000,000. The Gambles hoped to reorganize and continue farming, however they were unable to secure additional funding. On June 16, 2016, they converted their cases to Chapter 7. Gerald Miller was assigned as the Chapter 7 Trustee ('Trustee") for all three Gamble cases. Pinnacle timely filed its proof of claim in Michael's case on June 23, 2016, Claim No. 7, in the amount of $568,108.90.[10]

_____

[8]*See* Attachments to Pinnacle's Proof of Claim 7-1, filed June 23, 2016. The judgment actually states that is entered "in favor of" Othel and Michael jointly and severally. Apparently this language is in error. Pinnacle's proof of claim treats this as a joint and several judgment against Othel and Michael.

[9]Pl.'s. Ex. 1-032, Case No. CV-16-75-S, Circuit Court, Sebastian County, Arkansas. The bankruptcy trustee later recovered these funds through a preference action, Case No. 17-8006.

[10]Pinnacle also filed a proof of claim for $1,371,588.47 in the Othel H. Gamble, Jr. case, and the G&G case.

Michael filed his schedules and Statement of Financial Affairs ("SFA") three weeks after filing his petition. To these he attached a copy of his 2015 Form 1040 U.S. Individual Tax Return with Schedule F Profit or Loss From Farming, and a detailed list of farm equipment owned. His reported adjusted gross income for 2015 was $266,762, and federal income tax owed was $68,365.[11] Schedule F of his tax return reported crop insurance proceeds of $43,240.[12] Michael listed secured claims on bankruptcy Schedule D totaling $2,136,000. This included $430,000 on a judgment lien of Farmers Cooperative, $40,000 to CNH Capital for a case sprayer, a claim for $466,000 to FNB for a blanket lien on all crops, equipment, accounts and cattle that was cross-collateralized with G&G assets and Othel's assets, and Pinnacle's claim for its judgment lien valued at $1,200,000.[13] He reported unsecured priority claims of $68,365 owed to the IRS for 2015 federal taxes, and $10,178 owed to the Oklahoma Tax Commission for 2015 income taxes. Nonpriority unsecured claims included $7800 owed to Grissom Implement Co., a Chase credit card, and a claim of Monsanto for crop inputs with an unknown value. In his SFA, he reported gross income through the date of filing at $185,000. He listed payments made within 90 days of filing to Grissom Implement for $8200, and $225,000 to FNB. He listed two pending lawsuits: Pinnacle's garnishment action in Arkansas, and a collection action dating from 2013 by Farmers Coop in LeFlore County, Oklahoma. Michael also identified three payments in July of 2015 on a debt owed to an insider: Margaret Gamble Trust for 1/4 crop sold in the Trust's name,

---

[11]Pl.'s Ex. 1-025-26.

[12]Pl.'s Ex. 1-027.

[13]Pl.'s Ex. 1-013-14.

Eddie Cowan for 1/4 crop sold in landlord's name, and Opel (*sic*) Gamble Trust for 1/4 crop sold in that Trust's name.[14]

In preparing his schedules and SFA, Michael relied on his bank records and tax returns. Michael remembered general information about his expenses, but otherwise would have to refer to bank records for accurate information about deposits and expenses. At trial, Michael acknowledged preparing and signing his bankruptcy petition and schedules under penalty of perjury. He stated that they were true and correct to the best of his knowledge at the time he signed them. Although income he received in years preceding his bankruptcy may have seemed sufficient to pay his creditors, relying on gross income was misleading since his expenses could exceed his income. For example, his expenses for chemicals and seeds were nearly $100,000 in 2015. His net income from crops in 2015 was $35,398.

Michael's schedules did not list payments made to Sheila Perdue for her share of the profits of M & G Farms poultry operation. He believed that payments made to her were for wages or contract labor which were reflected in his bank statements. He explained that he believed he did not need to separately list these in his schedules since they were included in his bank statements and tax return which was attached to his schedules.

In answering question 31 of his SFA, Michael disclosed that he owned two life insurance policies with his spouse as the beneficiary. He provided no further details such as the names of the insurance companies or the value of each policy. He did not provide this information when he amended his schedules. Information was provided to the Trustee that he and his brother Othel

---

[14]Pl.'s Ex. 1-032. The amended schedules corrected the misspelling.

were the owners of a $100,000 policy insuring their mother, Margaret Gamble.[15] This policy had

a cash value of $67,978.16 when they filed bankruptcy.

Othel and Michael were beneficiaries of their parents' trusts, although they both testified

they were not aware of their interest in the trusts prior to the bankruptcy. Their beneficial

interests in the Othel H. Gamble, Sr. Trust and the Margaret Gamble Trust were not disclosed in

their schedules or the SFA.[16] However, Michael's SFA noted the existence of these trusts in

Question 7 when he listed payments made to insiders. Othel testified that he knew his parents

had trusts, but he did not know he was a beneficiary nor did he know anything about the assets or

operation of the trusts. He described his mother as someone who did not "advertise her

business." Michael also described their mother as someone who did not tell others her business,

including him.

Their father, Othel Sr., died many years prior to them filing bankruptcy. After their

father's death, their mother Margaret became the successor trustee of Othel Sr.'s trust. In 2010,

Margaret appointed Othel and Michael as co-successor trustees of Othel Sr.'s trust and her own

trust.[17] Othel testified that he was not aware of this. After Othel and Michael filed bankruptcy,

Margaret named Othel's wife Kay as a successor trustee of her trust.[18] Margaret died in January

of 2017 and Kay was appointed trustee of the Othel Sr. trust. The order appointing Kay entered

by the LeFlore County District Court stated that Othel Jr. and Michael had executed waivers and

---

[15]Case. No. 16-8018, Pl.'s Ex. 17.

[16]G&G's schedules included references to the Othel and Margaret Gamble Trusts. *See* Pl.'s Ex. 3-014, 018.

[17]Pl.'s Ex. 11.

[18]Pl.'s Ex. 15.

consented to her appointment.[19]  Michael acknowledged that he received several distributions from his mother's trust, which he stated were gifts that he used for living expenses when money was very tight.  He did not list these gifts in his schedules or SFA.

In response to Question 15 in the SFA regarding losses from theft, fire, other disaster or gambling, Michael disclosed that he had crop losses from floods in May and December of 2015 of an unknown value.[20]  He did not list the insurance claim proceeds received before filing bankruptcy, although the amount he received was listed in his 2015 Federal Income Tax Return attached to his bankruptcy schedules.[21]  After filing, but while he was in Chapter 12, Michael received a payment for prevented planting of $15,070.  He deposited this into his Community State bank account and used it to purchase fuel and pay wages.

As reported on Schedules I and J, Michael's farming operations involved large sums of money.  Michael's estimated monthly farm income was $40,865.  Monthly farm expenses were $35,681.  His monthly net income was $1800.[22] The bank records and  tax returns of Michael and Othel Gamble and G&G confirm that large sums of money flowed through their bank accounts.  As Othel explained, he would call FNB  for an advance on his or G&G's line of credit, the money would be transferred or advanced into his joint checking account or G&G's account, and any income he received would be deposited at FNB and applied to the line of credit.  No evidence was presented to refute his testimony, and bank records confirmed that advances and transfers were deposited into the FNB accounts.  Bank records also reflected that Michael's

---

[19]Pl.'s Ex. 12.

[20]G&G identified a crop insurance check for $40,600 in its Schedule A/B.  *See* Pl.'s Ex. 3-003.

[21]*See* Pl.'s Ex. 1-028.

[22]Pl.'s Ex. 1-021-24.

income consisted of draws from his line of credit, payments from OK Industries for his poultry operation, and social security income. Bank records revealed monthly farming and personal expenses, providing a sufficient explanation to the Court of where monies were spent.

Michael amended his schedules once after filing. On September 2, 2016, he amended Schedules A/B, C, D, E/F and G and the Matrix.[23] He included legal descriptions of real estate, added exemptions, added creditors and addresses. These amendments did not include adding details regarding his interests in the life insurance policies, payments made to insiders prior to filing, nor receipt of crop insurance proceeds.

Trustee Gerald Miller testified on behalf of the Gambles. Miller has been a chapter 7 trustee for 25 years. He estimated that he has administered over 75,000 cases. A typical chapter 7 case is a consumer case with primarily credit card debt. However, the Gamble cases fell into a different category of business cases to which Miller devotes special attention. In such cases, he sends a letter to a debtor's counsel requesting bank records, titles, mortgages and deeds, financial records and a request for a 2004 exam. He requested those items in this case and conducted 2004 exams of Othel, Michael, and their wives.

The cases also garnered extra attention from the Trustee because Othel and Michael filed as individuals, not jointly with their wives. The Trustee looked for transfers of property to spouses. The Gambles provided bank statements and checking account registers. Their non-filing spouses also cooperated fully with him. The business records provided contained adequate information by which the Trustee was able to investigate and track financial affairs dating back a number of years before bankruptcy. The Trustee noted that there were some checks that were not payable to the debtors so the funds could have been converted to their personal use without the

---

[23]Pl.'s Ex. 2.

Trustee knowing about them.  However, the debtors voluntarily turned these over to him without a special request.  Debtors also voluntarily turned over $100,000 to the Trustee prior to their 341 meetings without any request of the Trustee.

The Trustee testified that he became aware of the Othel Sr. and Margaret Gamble Trusts very early on during his involvement in the Gamble cases.  He stated that the existence of the trusts was never hidden from him but that the assets in the trust were not assets that he could obtain for the bankruptcy estate.  He examined the trust documents and did not find them unusual.

The Trustee received crop insurance proceeds of $40,687 in July of 2016 from a claim made by G&G.   He also received the proceeds of the combine claim made by Othel of $67,591.  Sale of Michael's farm and irrigation equipment generated $153,975 for his bankruptcy estate.[24]

In examining the debtors' schedules, the Trustee stated that he found them adequate when initially filed.  Due to the volume of assets, large area involved, and size and complexity of the operations he believed these to be difficult cases to identify all assets and transactions.  Any omissions were adequately explained and corrected.  The Trustee described both Othel and Michael Gamble as candid and very cooperative.  They responded promptly to his requests for information and he believed them to be truthful and honest in their dealings with him.  Because there were three related cases, the Trustee reviewed tax returns and depreciation deductions to identify ownership of some of the farm equipment.  This equipment was spread out over a 900 square mile area.  The Gambles assisted the court-appointed auctioneer in gathering all equipment for sale by accompanying the auctioneer throughout their property to locate and identify all items to be sold.  The Trustee believed that some equipment may not have been

_____

[24]Case 16-80193, Trustee's Interim Report, Docket 206, July 24, 2017.

located had it not been for the assistance and full cooperation of the Gambles. He stated several times during his testimony that he could not have located all assets and collected funds without the full cooperation of the debtors. He declined to bring a § 727 action against either Othel or Michael, finding no basis for him to file any action against them.[25]

The Court finds Othel and Michael to be credible witnesses. They gave a very good overview of their business operations, although they were generally unable to provide detailed information about specific purchases and identify exact amounts spent. Both debtors repeatedly stated that a review of their bank accounts would yield the specifics of their farming income and expenses. They certainly knew about the actual farming operations: the planting of crops, the equipment they used, the weather conditions, the acreage they farmed, insurance, their banking relationships, and the mechanics of raising cattle and chickens. They also explained the procedure for obtaining and making claims on crop insurance and for prevented planting, distinguishing them from general property and casualty insurance. Prevented planting payments as well as crop insurance did not begin to cover total losses. The Court finds their explanations of their farming operations and their statements that income generated from these operations was used to pay down their lines of credit and was invested back into their farms to be truthful. Their testimony revealed no hints of fraudulent intent to conceal assets, failure to disclose information in their schedules, nor any intent to mislead or defraud their creditors. On the contrary, the Court finds that their sole goal in the year leading up to filing bankruptcy was to continue their farming operations in an effort to generate sufficient income to pay their creditors. They tapped every resource available, including life insurance, to continue farming.

---

[25]The Trustee did bring an adversary proceeding against Pinnacle (Case No. 17-8006) to avoid Pinnacle's lien on the garnished funds. Pinnacle consented to avoidance of its lien.

Pinnacle characterized the Gambles and their farming operations as "sophisticated," emphasizing the fact that they farmed thousands of acres and generated millions of dollars in annual revenue. However, the Court does not believe that characterization is accurate. While their farming operations were sizable, size alone does not equal sophistication. The Court believes that the Gambles' area of expertise is in farming, gained through decades of experience. However, their business records, while detailed, were bank statements, not a sophisticated accounting system. Until a few years ago, they used handwritten ledgers to track expenses. They relied on BKD, providing their bank records to it to review and prepare basic financial statements and tax returns from those records.

The Gamble brothers are not sophisticated nor highly educated. They have been farmers in Spiro, Oklahoma all of their lives. Their inability to recall and offer detailed explanations regarding financial transactions while farming thousands of acres does not seem unusual or inconsistent to this Court. Nor does it indicate a scheme designed to defraud their creditors. The fact that the Gambles hired BKD, a professional accounting firm, to prepare tax returns is consistent with their testimony and the Court's belief that their expertise was in farming. Employing BKD to provide accounting services seems a prudent course designed to allow the Gambles to do what they did best — farm. They did not, however, shirk their responsibilities to creditors to prudently manage their farming operations and be aware of their financial condition. Although they did not give exact amounts of their business income and expenses, they knew approximately how much income their farming operations generated and the monthly costs associated with those operations. The Court finds that they provided adequate explanations of how their money was spent. They identified insurance payments, they identified the work performed by others, they were well-informed about crop insurance, how it operated, the

companies that insured them, the property that was damaged and the claims that were made. The Court did not detect a cavalier attitude regarding disclosures of assets, expenditures, or transfers to relatives, nor did the Gambles exhibit a lack of remorse. Instead, the Court detected an attitude of resignation that despite their best efforts and tapping every resource they could, their farming careers were over.

## III.      Conclusions of Law

### A.      Denial of Discharge.

#### 1.      Standard for Nondischargeability.

Debtors seek bankruptcy protection for a variety of reasons, but primarily they do so to "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[26]   This is why denial of a debtor's discharge is an extreme step.  The protections of the Bankruptcy Code are to be construed liberally in favor of the debtor and strictly against the creditor, with exceptions to discharge narrowly construed, and doubts resolved in the debtor's favor.[27]   The party objecting to discharge has the burden of proving by a preponderance of the evidence that grounds exist supporting the denial.[28]   Pinnacle seeks to deny Michael Gamble  a discharge on four different grounds: § 727(a)(2)(A) and (B) for fraudulent concealment and/or transfer of property of the debtor or estate; § 727(a)(3) for failure to keep and preserve adequate

---

[26] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934).

[27] *See Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997); *Bank One v. Kallstrom (In re Kallstrom)*, 298 B.R. 753 (10th Cir. BAP 2003).

[28] Fed. R. Bankr. P. 4005; *Mathai v. Warren (In re Warren)*, 512 F.3d 1241 (10th Cir. 2008); *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156 (10th Cir. 1991).

records regarding debtor's financial condition or business transactions; § 727(a)(4)(A) for knowingly and fraudulently making a false oath or account; and § 727(a)(5) for failure to explain satisfactorily any loss or deficiency of assets to meet the debtor's liabilities.  The Court will address each separately.

### 2.    § 727(a)(2)(A) and (B): fraudulent concealment and/or transfer of property.

To deny Michael Gamble's discharge under this section, Pinnacle must prove that Michael either personally or allowed someone else to transfer, remove, destroy, mutilate or conceal his property or property of the bankruptcy estate with the intent to hinder, delay or defraud a creditor or officer of the bankruptcy estate.  The time period to review is one year prior to filing the bankruptcy and after the date of filing.  The United States Supreme Court calls this subsection "a blunt remedy for actions that hinder the entire bankruptcy process . . . ."[29]  The "intent" element of this section must be an actual intent to defraud creditors.[30]   Actual fraudulent intent may be established through circumstantial evidence as well as inferences from a debtor's conduct.[31]   Although a single wrongful act or omission may be sufficient to prove actual intent, "evidence of a pattern of wrongful behavior presents a stronger case."[32]   In other words, courts

---

[29]*Husky Int'l Electronics, Inc. v. Ritz,* 136 S. Ct. 1581, 1589 (2016).

[30]*Warren*, 512 F.3d at 1249, *citing Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991).

[31]*Warren,* 512 F.3d at 1249, *citing Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

[32]*Freelife, Internat'l LLC v. Butler (In re Butler)*, 377 B.R. 895, 916 (Bankr. D. Utah 2006) quoting *E. Diversified Distr., Inc. v. Matus (In Re Matus)*, 303 B.R. 660, 672 (Bankr. N.D. Ga. 2004).

should consider a debtor's "whole pattern of conduct."[33]  Concealment is defined as hiding

property or withholding information about an asset that the law requires be disclosed.[34]

The Court does not believe that Pinnacle met its burden of proof to deny discharge on this

ground.  When the Court reviews the "whole pattern of conduct," it concludes that the evidence

does not indicate an intent to defraud.  There was no evidence that Michael Gamble intentionally

concealed or transferred property with the intent to defraud Pinnacle, the Trustee, or other

creditors.  Nothing in Michael's lifestyle suggests that he had more income or assets than what he

disclosed or the Trustee discovered.  He owned farm acreage, a home, and farm equipment.  He

does not own a personal vehicle, but drives a farm truck.  His lifestyle was not extravagant nor

luxurious in any way.

None of the badges of fraud are present here.  There was no evidence of deliberate

concealment, no allegations or evidence of conversions or transfers of assets to insiders without

consideration, no allegations or evidence of gratuitous transfers of assets, no transfer of assets on

the eve of bankruptcy in an attempt to keep them out of the estate, no allegations or evidence of a

lack of cooperation with the Trustee.[35]  Michael's testimony that he began to use his Community

State bank account because he  believed his FSB account was no longer available to him due to

Pinnacle's garnishment was credible.  Although the parties were engaged in lengthy discovery

disputes regarding business records, these records were readily provided to the Trustee and were

ultimately produced to Pinnacle.  The Gambles made several offers to sit down with Pinnacle to

review financial records.  Ultimately, this is what the Court ordered the parties to do.  The Court

---

[33]*Matus,* 303 B.R. at 672.

[34]*See In re Recupero,* 2014 WL 1884331, at *7 (Bankr. N.D. Ohio 2014).

[35] *See e.g. Phillips 66 Co. v. Ritchie (In re Ritchie),* 543 B.R. 311, 321 (Bankr. D. N.M. 2015).

also sanctioned the Gambles for their delay and awarded Pinnacle $2000 for attorney fees from each defendant.   In presiding over these discovery disputes, the Court never believed that the Gambles' delay was part of a plan to defraud Pinnacle or hide their business records from Pinnacle.

Regarding his interest in his parents' trust, Michael answered "No" when asked about any interest in property someone who has died (question 32 on Schedule A/B).  However, he did give notice that his parents had trusts in Schedule G, and they were disclosed in G&G's schedules, as well.  The existence of his parents' trusts was known to the Trustee early on during the case. Pinnacle attended the 341 meetings and the 2004 exams of both Othel and Michael, and was a creditor in the three Gamble cases.  Michael's explanation that he did not know he was a beneficiary of his parents' trusts is credible and sufficient to this Court.  The Court finds no intent to conceal the existence of these trusts in an effort to mislead or defraud Pinnacle or any other creditor.

Michael did not list any of his insurance claims on Schedule A/B.  However, he did list crop  losses due to floods in May and December of 2015 in his SFA.  And, he listed payments on crop insurance in his 2015 federal tax return which was attached to his schedules.  The Court concludes that this is a sufficient notice of potential insurance claims, and is evidence that he did not intend to conceal the insurance proceeds from creditors.  Likewise, although he did not give detailed information about his life insurance policies as requested in question 31 of Schedule A/B, he did disclose that he was the named insured on two life insurance policies.  The Court concludes that this is sufficient notice and does not establish concealment of these interests from creditors sufficient to support a denial of discharge.

As the Court has found Michael's testimony to be credible and unrefuted, it cannot infer from Michael's conduct or testimony that he engaged in a pattern of wrongful conduct with the intention of misleading Pinnacle in an effort to defraud it. Instead, the evidence established that any transfers to insiders were for wages earned with appropriate payroll taxes withheld and remitted, that claims against insurance for flood damage and lost crops were listed and included in tax returns, deposits and use of bank accounts were explained, answers were provided for questions raised. Construing this exception to discharge narrowly, and resolving any doubt in Michael's favor, the Court concludes that discharge should not be denied on this ground.

### 3.    § 727(a)(3): failure to keep and preserve adequate records.

To establish a prima facie case under this section Pinnacle must show that Michael "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material* business transactions."[36] If Pinnacle meets this initial burden, it shifts to Michael to justify his failure to maintain records. The scope of a debtor's duty to maintain adequate records depends on the nature of his business and the facts and circumstances of each case.[37] Records need not be so complete as to detail all or substantially all transactions that took place. They need only be sufficient to allow an intelligent inquiry.[38] Unlike other exceptions to discharge, no proof of a debtor's intent to defraud or conceal is required.

---

[36] *The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 615 (10th Cir. BAP 2001) (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997)), *aff'd*, 35 Fed. Appx. 811 (10th Cir. 2002).

[37] *Martinez v. Sears (In re Sears)*, 565 B.R. 184 (10th Cir. BAP 2017).

[38] *Blackwell Oil Co. v. Potts (In re Potts)*, 501 B.R. 711 (Bankr. D. Colo. 2013).

Pinnacle did not establish a prima facie case under this subsection.  Michael provided

bank records dating from a year prior to filing bankruptcy though May 31, 2016.  These records

include copies of checks written on these  accounts, primarily from Michael's FNB account.

Michael wrote checks to pay wages from this account, noting withholding of employment taxes

in the memo line.  Most checks included a brief description in the memo line of the purpose of

the payment.  Most of his payments were for his farming operations.  Monthly statements also

listed automatic drafts for telephone accounts, utilities, IRS payments, and insurance premiums.

Deposits were identified as advances into the account, as sales of crops or chickens, or as

insurance proceeds.  There were overdraft charges on the FSB account.

Bank records of G&G were also submitted to the Court.  Checks written on that account

included brief descriptions of the expense, such as fuel, repairs, machinery purchased, repair

parts, and labor.  Large advances were deposited into the G&G account, but monthly expenses

were approximately equal to monthly advances deposited into that account.  The bank records of

his mother's trust account were also provided.  The Court concludes that the records were

adequate to inform creditors and the Trustee what operations were conducted by the Gambles and

G&G.  The bank records, tax returns, insurance documents, and trust information enabled

creditors to ascertain Michael's financial condition and material business transactions.  The

evidence does not support denial of discharge on this ground.

**4.** **§ 727(a)(4)(A):  knowingly and fraudulently making a false oath or account.**

Debtors have a duty to carefully, completely and accurately prepare schedules. The

purpose of  § 727(a)(4) is to enforce this duty.  A debtor must provide sufficient information and

details to enable the trustee to determine whether to investigate further.[39]  To deny a discharge under this section, a court must determine that the debtor acted knowingly and fraudulently in making a statement or omission under oath, and that the statement or omission is material to the case.  The standard of materiality is low, encompassing anything that bears a relationship to a debtor's business transactions or discovery of his assets.[40]  However, a false statement based upon a mere mistake or inadvertence is insufficient to deny a discharge.  The statute requires a knowing and fraudulent false oath.  In determining fraudulent intent, courts look to the facts and circumstances of each case.

Pinnacle argues that Michael knowingly and fraudulently made a false oath or account and knowingly withheld information from his bankruptcy schedules regarding assets, including crop insurance claims and proceeds, life insurance, payments to insiders, his business relationship with Sharon Perdue, and interests in his parents' trusts.  However, even if the Court assumes the omissions were material, it is not enough that Pinnacle identify inaccuracies and inconsistencies in Michael's schedules.  To deny his discharge under § 727(a)(4)(A), the Court must find that Michael omitted information with an intent to defraud and mislead his creditors.[41]

The Court finds that Pinnacle did not meet its burden to deny discharge by a preponderance of the evidence.  The Court finds and concludes that any omissions from Michael's schedules were innocent, not deliberate, and therefore did not meet the knowing and fraudulent standard of § 727(a)(4).  Michael's schedules disclosed that he suffered two crop

---

[39] *Hermann v. Hartford Casualty Insurance Co.*, 675 Fed. Appx. 856, 860 (10th Cir. 2017)(unpublished), citing *Payne v. Wood*, 775 F.2d 202, 205-206 (7th Cir. 1985).

[40] *In re McNally*, – Fed. Appx. – , 2018 WL 2974411 *4 (10th Cir., June 13, 2018), citing *In re Calder*, 907 F.2d 953, 955 (10th Cir. 1990).

[41] *See McVay v. Phouminh (In re Phouminh)*, 339 B.R. 231, 242 (Bankr. D. Colo. 2005).

losses and included dates of the losses. He attached a copy of his tax return to his bankruptcy petition, which included the amount he was paid in 2015 in crop insurance proceeds. This does not support Pinnacle's claim that Michael's failure to include detailed information regarding insurance claims and crop insurance proceeds and his failure to identify his parents' trusts was designed to hide information, thereby misleading and defrauding his creditors. Michael attached a detailed list of farm equipment owned. He disclosed that he carried life insurance. Although he did not list his interest as a beneficiary of his parents' trusts, his explanation that his mother did not provide detailed information regarding her financial dealings, and that he did not know he was a beneficiary was a credible explanation of the omission from Schedule A/B. And, he disclosed the existence of his parents' trusts. His schedules provided sufficient information to enable the Trustee and creditors to decide whether to investigate further.

The Court does not believe the Gambles to be remotely similar to the debtor in *Wagner*, whom the trial court described as "an individual who will say virtually anything the situation seems to require."[42] Nor does the Court find any similarity between the Gambles and the debtor in *In re Gordon*.[43] Debtor Gordon was convicted on criminal charges regarding securities fraud, and was described as "a sophisticated businessman, attorney, and CPA" who "surely understood the implications of filing a bankruptcy petition."[44] He omitted numerous assets, including financial accounts, and interests in companies in which he was an officer or director, and was anything but an honest and unfortunate debtor. The trial court found that his business

---

[42] *Wagner*, 492 B.R. at 48.

[43] *Wieland v. Gordon (In re Gordon)*, 526 B.R. 376 (10th Cir. BAP 2015).

[44] *Gordon,* 526 B.R. at 384.

transactions were designed to defraud his creditors. Having personally observed the Gambles at trial, the Court finds no such intent in this case to knowingly and fraudulently make a false oath.

Michael's records revealed where he deposited monies from crop insurance payments, and identified the source of deposits into his accounts and G&G's account. He promptly responded to requests for information from the Trustee, assisted the Trustee in locating assets, turned over all bank statements and financial records prepared by his accounting firm, BKD, and provided trust documents for his parents' trusts to the Trustee.[45] The Court finds him to be an honest, credible witness, and an unfortunate debtor. He certainly was not reckless with or indifferent to the truth. He used all funds available to fund his farming operation. Having reviewed his testimony and the documentary evidence in detail, the Court finds that Michael provided a satisfactory explanation that his omissions were not intentional but simply inadvertent or based upon a mere mistake. His actions were to keep their farming operations afloat and generate income to pay his creditors. The Court finds that he did not knowingly or fraudulently omit information from his bankruptcy schedules, nor does the Court believe there was any intent to deceive his creditors.

**5.      § 727(a)(5): failure to explain satisfactorily any loss or deficiency of assets to meet the debtor's liabilities.**

A discharge may be denied if the debtor has failed to explain satisfactorily any loss or deficiency of assets to meet the debtor's liabilities. A creditor's burden is to prove facts

---

[45]*See Gullickson v. Brown (In re Brown*), 108 F.3d 1290, 1294 (10th Cir. 1991) ("No inference of fraudulent intent can be drawn from an omission when the debtor promptly brings it to the court's or trustee's attention absent other evidence of fraud." (italics omitted). *See also In re Fink*, 351 B.R. 511, 527 (Bankr. N.D. Ill. 2006) ("Although a debtor cannot necessarily redress a false oath by making a subsequent correction, the fact that a debtor comes forward with omitted material of his own accord is evidence that there was no fraudulent intent in the omission.") (citations omitted).

establishing that a loss or shrinkage of assets actually occurred. It does not need to demonstrate any fraudulent intent by the debtor. Once it meets its initial burden of proof, the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner.[46] The purpose of § 727(a)(5) is to provide documentation to trace how assets were depleted so that interested parties do not have to speculate as to what happened to a debtor's assets. A debtor must provide some corroboration of his explanation which is sufficient to eliminate speculation as to what happened to his assets.[47] Determining whether an explanation is sufficient is left to the sound discretion of the court.[48]

Michael provided numerous bank records detailing expenditures. He attached his tax return to his bankruptcy schedules. He also produced documentation regarding the payment of insurance proceeds. He explained that everything he earned and everything G&G earned was invested back into his farming operations or spent on living expenses. It appears to the Court that Michael fully disclosed, documented and explained the events that led him to file bankruptcy. As a farmer, he had no control over the weather. His farming operations suffered from multiple years of drought only to be followed by a year where he suffered not one, but three floods. The Court is not convinced that Michael has hidden or improperly shielded assets from his creditors. Instead, the Court believes that Michael's efforts were focused on keeping his farm operating, generating income so that he could pay his creditors, and making a living. He did have some assets available and these were liquidated for the estate. He substantiated his

---

[46] *The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001).

[47] *See Grassman v. Brown (In re Brown)*, 570 B.R. 98, 118 (Bankr. W.D. Okla. 2017)(citations omitted.). *See also In re Ritchie*, 543 B.R. at 324-25.

[48] *Martinez v. Sears (In re Sears)*, 565 B.R. at 192 (citing *Potts*, 501 B.R. at 726, and cases cited therein.)

expenses by opening his checkbook and providing bank statements. Michael's explanation of where his income was spent, and his inability to generate sufficient income to meet his expenses was plausible, reasonable and credible to the Court. Therefore, the Court finds no cause to deny discharge under § 727(a)(5).

**B.    Exception to Discharge  under 11 U.S.C. § 523(a)(2)(A): False Pretenses, False Representation, or Actual Fraud**.

As with denials of discharge under § 727, exceptions to discharge must be construed strictly against a creditor and liberally in favor of the debtor, to effectuate the Bankruptcy Code's purpose of giving the honest but unfortunate debtor a fresh start.[49] The party seeking to except a debt from discharge bears the burden of proving its claims by a preponderance of the evidence.[50]

Pinnacle asserts that Michael's debt should be excepted from discharge under § 523(a)(2)(A) as money obtained by false pretenses, a false representation, or actual fraud.[51] To establish that a claim is nondischargeable under this section, the creditor must prove: (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was reasonable; and (5) the debtor's representation caused the creditor to sustain a loss.[52]

Pinnacle presented no testimony or evidence from its own representatives. No corporate representative attended the trial. Pinnacle did not identify any false representation that was made to entice it to extend monies or credit to the Gambles. No evidence was presented that the

---

[49]*Affordable Bail Bonds, Inc. v. Sandoval (In re Sandoval)*, 541 F.3d 997 (10th Cir. 2008).

[50]*See Grogan*, 498 U.S. at 291.

[51]Pinnacle did not address its claim under § 523(a)(2)(A) in its post-trial brief.

[52]*Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996).

Gambles submitted false financial information, made false assurances of ability to pay, or similar conduct. No evidence was presented that either of the Gambles made any representation with an intent to deceive Pinnacle. No evidence was presented regarding Pinnacle's reliance on a representation, nor how it made a decision to sell its products or extend credit to the Gambles. Its proof of claim and judgment reflects that Pinnacle sustained a loss, but there is no evidence that the loss was caused by a false representation or fraud by the Gambles. The Court finds that Pinnacle failed to meet its burden to except its debt from discharge under § 523(a)(2)(A).

## IV. __Conclusion__

For the reasons stated above, the Court finds that Pinnacle did not meet its burden of proving that Michael Gamble's discharge should be denied under 11 U.S.C. § 727. The Court also finds that Pinnacle failed to provide any evidence that its debt should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A). Accordingly, the Court will enter judgment in favor of Defendant Michael G. Gamble and grant his discharge.

A separate judgment shall be entered in accordance with this Opinion.

###